Robert ROBBINS, et al., Appellants

v.

Ronald REAGAN, et al.

Robert ROBBINS, et al.

v.

Ronald REAGAN, et al., Appellants.

Nos. 85–5864, 85–5943.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 26, 1985.

Decided Dec. 10, 1985.

Peter J. Nickles, with whom K. Gregory Tucker and Florence W. Roisman, Washington, D.C., were on brief, for appellants in No. 85–5864 and cross-appellees in No. 85–5943.

Edith S. Marshall, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Darrel J. Grinstead, Asst. Gen. Counsel, and Ellen Dickstein Kominers, Atty., Dept. of Health and Human Services, Washington, D.C., were on brief, for appellees in No. 85–5864 and cross-appellants in No. 85–5943. Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., also entered an appearance for Reagan, et al.

Before ROBINSON, Chief Judge, and WALD and BORK, Circuit Judges.

Opinion for the Court PER CURIAM.

Opinion concurring in the judgment in part and dissenting in part filed by Circuit Judge BORK.

PER CURIAM:

This appeal is part of the ongoing controversy surrounding the tragic and growing problem of homelessness in the District of Columbia. At issue is the decision by the federal government, through the Department of Health and Human Services ("HHS"), to close a federally-owned building at Second and D Streets, N.W., which appellant, the Community for Creative Non-Violence ("CCNV"), has operated as a shelter for the homeless since January 15, 1984.[1] The federal government had committed itself in November of 1984 to convert the facility into a model shelter. This litigation ensued when CCNV and the federal government were unable to reach agreement on the extent of repairs necessary to fulfill this commitment.

Appellants seek reversal of the District Court's grant of appellees' motion for summary judgment on appellants' claim that the decision to close the shelter was arbitrary and capricious and thus violative of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. (1982). Appellants also challenge the dismissal of their promissory estoppel claim that the government is precluded from reversing its pledge to build a model shelter. Appellees contend that the District Court lacked jurisdiction to consider these claims, that the APA claims are nonreviewable, and that the District Court exceeded its authority in requiring appellees to assist in locating adequate alternative shelter for the Second and D Streets residents.

We affirm the result reached by the District Court except to the extent that the court imposed requirements on the appellees that go beyond resolution of the present dispute.

## I. BACKGROUND

The current controversy began in December 1983 when CCNV petitioned the Department of Health and Human Services' Federal Task Force on the Homeless to allow CCNV to utilize the then-vacant building at Second and D Streets, N.W., as a temporary shelter for the homeless. The General Services Administration ("GSA"), which owns the building, issued a permit to HHS allowing use of the building as a shelter. HHS then issued a three-month license to the District of Columbia government, which assigned the license to CCNV. The shelter opened on January 15, 1984.

CCNV subsequently requested that the shelter be kept open on a permanent basis. GSA indefinitely extended HHS' license. HHS offered to extend the District's license as well, but the District government refused the offer. Thereafter, HHS informally allowed CCNV to continue operation of the shelter.

CCNV then commenced efforts to secure funds to renovate the building. The Chairman of the Federal Task Force, Dr. Harvey R. Vieth, refused CCNV's request for federal funds, maintaining that homelessness was the responsibility of local governments and that requests for renovation or support services should be directed to the District government. Plaintiff Mitch Snyder responded by commencing a fast on September 15, 1984.

After 50 days, CCNV and HHS reached an apparent agreement—renovations would be completed at federal expense. Margaret M. Heckler, then Secretary of HHS, informed appellants that President Reagan had requested that HHS transform the facility "into a model physical shelter structure to house the homeless in the District of Columbia."[2] Secretary Heckler outlined

---

1. Appellants also include several inhabitants of the Second and D Streets shelter as well as two members of CCNV.

2. See Statement of Health and Human Services Secretary Heckler (Nov. 4, 1984), Exhibit B to Declaration of Mitch Snyder, *Robbins v. Reagan*, Civ. No. 85–1963 (D.D.C.) (filed June 17, 1985), Joint Appendix (J.App.) 333.

seven specific renovation goals.[3] HHS officials later determined that funding for the shelter project would be drawn from monies appropriated for the Community Services Block Grant Act.[4]

Emergency repairs were completed between December 1984 and February 1985 at a cost of approximately $90,000. However, the cooperation induced by Snyder's fast was short-lived. Disagreement regarding the scope of the federal commitment became apparent when CCNV submitted its renovation plan to the government. The GSA estimated that the CCNV proposal would cost $10 million.[5] HHS officials insisted they had never agreed to any renovation beyond the seven specific goals Secretary Heckler had announced— renovation that the government projected as costing $2.7 million. HHS formally authorized the $2.7 million expenditure on May 30, 1985. CCNV was provided with the government's renovation plan after threatening to abandon responsibility for the operation of the shelter.

CCNV subsequently protested the alleged inadequacy of the government's renovation plan and filed suit in the District Court on June 17, 1985. The original complaint sought to compel the defendants to perform all the renovation work CCNV believed was necessary to create a model shelter. CCNV demanded that the government take over operation of the shelter if it was not willing to renovate on this basis. Complaint ¶¶ 1, 28, *Robbins v. Reagan*, Civ.

No. 85–1963 (D.D.C.) (filed June 17, 1985), reproduced in Supplemental Joint Appendix 4, 13.

On June 21, 1985, Dr. Vieth announced that the government intended to close the shelter. Three reasons for the decision were announced: the deteriorated condition of the building, CCNV's refusal to cooperate with the GSA renovation plan and the absence of an organization willing to assume responsibility for operation of the shelter. Appellants sought and were granted a temporary restraining order barring appellees from posting notices of the future closing in the shelter. On June 26, appellants filed an amended complaint challenging the government's decision. Appellees then filed a motion to dismiss or, in the alternative, for summary judgment. After briefing and argument of the motion, the District Court remanded the matter to HHS, directing the agency to conduct notice and comment proceedings and to present a reasoned analysis for its decision. On July 26, the District Court issued a temporary restraining order, enjoining closure of the shelter pending completion of the remand proceedings and any subsequent review in the District Court.

On July 31, after analyzing the comments filed with HHS, Dr. Vieth recommended to Charles D. Baker, Undersecretary of HHS, that the shelter be closed but that the closure be delayed until August 31, 1985, "in order to permit the Task Force to exhaust all reasonable efforts to

---

**3.** The specific areas identified by Secretary Heckler were:

    1.  Adequate locker facilities for securing personal belongings of those utilizing the shelter.
    2.  Provisions of adequate shelter space for separate men's and women's quarters.
    3.  Adequate kitchen facilities for food preparation.
    4.  Laundry room facility.
    5.  Emergency first aid station.
    6.  Consultation rooms for social service providers.
    7.  Adequate fire prevention sprinkler system.
    *Id.*

**4.** That statute gives the Secretary discretionary authority to expend funds for "ongoing activi-

ties of national or regional significance related to the purposes" of the Act. 42 U.S.C. § 9910(a)(2) (1982). HHS officials concluded that this project qualified as a "special program☐ of assistance to private, locally initiated community development programs which sponsor☐ enterprises providing employment and business development opportunities for low-income residents of the area," and thus was eligible for funding under § 9910(a)(2)(A). See also 42 U.S.C. § 9904(c)(1)(B)(iv) (1982) (states required to certify that Community Services Block Grant Act funds are used to assist low-income participants to obtain "adequate housing and a suitable living environment").

**5.** CCNV maintained that its plan would cost only $5 million.

make alternative shelter arrangements." Dr. Vieth suggested that the $2.7 million be utilized in the relocation effort. J.App. 24–25. Undersecretary Baker adopted these recommendations and emphasized that:

> the most crucial step that must be taken ... is to bring to successful conclusion [the Task Force's] efforts with the government of the District of Columbia and local shelter providers to assist them in finalizing plans already discussed with them to identify and make ready for occupancy alternative shelter arrangements for the residents of the shelter at 425 Second Street, N.W.

*Id.* at 110.

On August 19, 1985, 616 F.Supp. 1280, the District Court issued its opinion dismissing or granting summary judgment for appellees on all of appellants' claims.[6] In an order accompanying the opinion, the District Court authorized the government to "reclaim the shelter" provided that the government had first "devise[d] appropriate interim and long range plans to eliminate homelessness in the Nation's Capital...."[7]

On August 20, 1985, this court denied appellants' emergency motion for expedited appeal without prejudice to appellants' right, if the District Court denied a stay pending appeal, to move for expedited consideration of such a stay in this court. The District Court then denied appellants' motion for stay pending appeal and on August 26, 1985, appellants moved this court for a stay pending appeal and for an emergency argument. Argument was heard on August 29, 1985, and the next day this court issued a per curiam order denying the motion and expediting the appeal. The denial was based on "appellees' in-court representation that they interpret the District Court order as preventing the federal government from reclaiming the building and closing the shelter until appellees have made specific arrangements for suitable alternatives for 'each and every person' who is currently utilizing the shelter." *Robbins v.*

*Reagan,* No. 85–5864 (D.C.Cir. Aug. 30, 1985) (order).

During the pendency of this appeal, the government continued its efforts to locate alternatives to the Second and D Streets shelter. The government ultimately awarded $3.7 million to the D.C. Coalition for the Homeless to assist in the renovation and operation of two shelter facilities. A 600-bed, temporary men's shelter has been established in Anacostia. A 60-bed shelter for women is now operating on Florida Avenue, N.W. While opened amidst considerable controversy, these facilities are providing much needed food, health care and shelter at a time of critical need.

Dissatisfied with the proposed alternatives, CCNV petitioned the District Court on October 10, 1985, to authorize discovery and conduct an evidentiary hearing on the adequacy of the alternative facilities. On October 15, 1985, the District Court postponed consideration of appellants' motion until the government announced a definite date for closing the shelter. Although the government had yet to make such an announcement, on November 19, 1985, the District Court ruled that the shelter could be closed as of 5:00 p.m. on November 21, 1985. This court temporarily stayed the District Court's order on November 20, 1985.

CCNV has also petitioned this court to require the government to complete emergency repairs to the Second and D Streets shelter.

## II. Section 1331 Jurisdiction Over The APA Claims

The government has raised two threshold challenges to CCNV's claim that the decision to close the shelter violates the APA: first, that the District Court did not have subject matter jurisdiction over this claim; and second, that the decision is not subject

---

6. *Robbins v. Reagan,* Civ. No. 85–1963 (D.D.C. Aug. 19, 1985) (memorandum) at 1, J.App. 12.

7. *Robbins v. Reagan,* Civ. No. 85–1963 (D.D.C. Aug. 19, 1985) (order) at 2, J.App. 59.

to judicial review as there is no federal law to apply in resolving this controversy.[8]

The District Court limited its jurisdictional inquiry in this case to determinations of whether the Tucker Act[9] or the doctrine of sovereign immunity precludes review. After answering both questions in the negative, the District Court presumed, without analysis, that it had subject matter jurisdiction over the APA claims pursuant to 28 U.S.C. § 1331, which confers jurisdiction on district courts over "all civil actions arising under the Constitution, laws or treaties of the United States." Appellees maintain that there is no federal law governing the decision to grant or revoke federal funds for maintenance of the shelter or to close it altogether, and thus that appellants' claims do not "arise under" federal law so as to be cognizable under Section 1331. Appellees' Brief at 17.

Appellees' jurisdictional challenge relies on the Supreme Court's decision in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), for the proposition that the APA does not itself serve as an implied grant of federal subject matter jurisdiction. Although this is an accurate characterization of the holding in *Sanders*, it does not inexorably lead to the conclusion that Section 1331 provides no basis for jurisdiction over APA claims. The *Sanders* Court demonstrated its rejection of appellees' reasoning in discussing the significance of an amendment to Section 1331 which eliminated the amount in controversy requirement:

> The obvious effect of this modification subject only to preclusion-of-review statutes created or retained by Congress, is to confer jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate.

*Id.* at 105, 97 S.Ct. at 984. Indeed, the Court applied just that standard, conclud-

ing in *Sanders* that "federal question jurisdiction under 28 U.S.C. § 1331 [was specifically] precluded by [the Social Security Act]." *Id.* at 109, 97 S.Ct. at 986. The Court thus declined to review the agency decision only because Congress specifically precluded judicial review of that particular type of decision under the Social Security Act. *Id.* at 109, 97 S.Ct. at 986.

■ In decisions subsequent to *Califano v. Sanders*, the Supreme Court has framed the analysis in the same terms: jurisdiction over APA challenges to federal agency action is vested in district courts unless a preclusion of review statute, such as the Social Security Act provision at issue in *Sanders* or Section 10(a)(2) of the APA,[10] specifically bars judicial review in the district court. For example, in *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), Justice Rehnquist, writing for a unanimous court, stated that "[j]urisdiction to review agency action under the APA is found in 28 U.S.C. § 1331." *Id.* at 317 n. 47, 99 S.Ct. at 1725 n. 47 (citing *Califano v. Sanders*). He undertook no further analysis of any jurisdictional issue. Instead, his analysis of whether the District Court had authority to rule on the propriety of the challenged agency action focused solely on whether any statute barred such review. *Id.* See also *Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604, 608 n. 5, 98 S.Ct. 2002, 2005 n. 5, 56 L.Ed.2d 570 (1978) ("jurisdiction in this action to review a decision of the Secretary of the Interior is clearly conferred by 28 U.S.C. § 1331(a)").

This court has also recognized that Section 1331 vests jurisdiction to review agency action in the district court. In *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.Cir. 1982), Judge Wilkey wrote: "Even though the APA itself technically grants no juris-

---

8. Appellees also maintain that the government has not waived its sovereign immunity with regard to promissory estoppel claims and that no Section 1331 jurisdiction exists over such claims. Jurisdiction over the APA claims is discussed immediately below. The promissory estoppel issue is discussed in Part VI.

9. 28 U.S.C. § 1346 (1982).

10. As discussed more fully in Section III *infra*, the government's next contention is that Section 10(a)(2) of the APA, 5 U.S.C. § 701(a)(2), does preclude review as there is no law to apply in resolving this controversy.

diction, power to review *any* agency action under the APA exists under 28 U.S.C. § 1331." *Id.* at 966 n. 30 (emphasis supplied). See also *Association of National Advertisers v. FTC,* 617 F.2d 611, 619 (D.C. Cir.1979) ("[g]eneral federal question jurisdiction ... gives the district courts the power to review agency action absent a preclusion of review statute"); *Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1065 n. 11 (D.C.Cir.1979) (jurisdiction to challenged agency action is found in Section 1331).

Professor Davis has reached the identical conclusion in his *Administrative Law Treatise.* As Davis states: "[N]o one is ever denied review of reviewable action of a federal agency for want of a court with jurisdiction because, unless exclusive jurisdiction to review is conferred on some other court [or withdrawn by statute] a district court always has jurisdiction to review federal administrative action under 28 U.S.C. § 1331...." 4 K. Davis, *Administrative Law Treatise* § 23:3 at 128–129 (2d ed. 1983).

█ Additional support for this result is found in application of three factors courts have traditionally considered in deciding whether an action arises under federal law: (1) the relation between the case and the federal law, (2) whether the federal law is applicable by its own force, and (3) the substantiality of the federal claim.[11] See generally 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* §§ 3562–3564 (2d ed. 1984). The allegations in the present case satisfy each of these requirements.

The relation requirement dictates that the federal claim be a "direct element" of the controversy. Wright, Miller & Cooper, *supra,* § 3562 at 32. The concern is that the mere presence of a tangential federal issue not transform an action into a federal case where the rights involved are rooted in state law. This federal-state tension is notably absent in the present case, which concerns action allegedly promised and withheld by a federal official acting under authority derived solely from a federal statute with regard to funds appropriated by Congress. Federal law is not only a direct element in this case, it is the only element.

Similarly, the case at bar involves the *kind* of federal law essential to federal jurisdiction. Again, the case law reveals that the primary focus of this inquiry is the relative roles of state and federal law. Unlike cases where this factor has indicated a lack of federal jurisdiction, this action does not present problems of state laws that integrate or rely on federal standards or refer to federal law for guidelines. See, e.g., *United Airlines v. Division of Industrial Safety,* 633 F.2d 814, 816 (9th Cir. 1980), *cert. denied,* 454 U.S. 944, 102 S.Ct. 485, 70 L.Ed.2d 255 (1981).

Finally, the federal claim raised in this action is a substantial one. The substantiality standard is easily met—an arguably plausible claim must be allowed to proceed. WRIGHT & MILLER, *supra,* § 3564 at 70–71. In *Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), the Supreme Court described the substantiality requirement as a three-tier construct. The first level of inquiry is whether the claim is wholly insubstantial and frivolous. If so, dismissal for lack of jurisdiction is appropriate. If the claim is not wholly insubstantial, a court should move on to consider whether the action should be dismissed for failure to state a claim upon which relief can be granted because of nonjurisdictional defects. The final tier comes into play if the allegations of the complaint are deemed sufficient to state a claim and discovery or further proceedings are warranted. In the

---

**11.** It should be noted that the bulk of the decisions applying these factors address whether federal or state court jurisdiction is appropriate when a defendant asserts that a claim involves state rather than federal law issues. See, e.g., *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Phillips Petroleum Co. v. Texaco, Inc.,* 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974); *Gully v. First National Bank in Meridian,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Shulthis v. McDougal,* 225 U.S. 561, 32 S.Ct. 704, 56 L.Ed. 1205 (1912). In contrast, this action presents no state law issues.

present case, the District Court correctly refused to dispose of appellants' claims on the first tier.

In sum, the District Court did not err in holding that it had jurisdiction to review the agency action in question under Section 1331.

### III. AVAILABILITY OF JUDICIAL REVIEW

Appellees [12] contend that their action is unreviewable because it was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). They argue that this case is governed by the Supreme Court's recent decision in *Heckler v. Chaney*, — U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), which held that agency decisions not to take enforcement action are generally not subject to judicial review. We conclude, as did the District Court, that the narrow presumption of nonreviewability established in *Chaney* is not applicable to this case. Moreover, viewing the issue in light of the strong presumption that agency action outside of the enforcement arena is reviewable, we conclude that appellees' action here is not immune from review, given the specific challenges presented.

### a. *General Principles*

In *Chaney*, prison inmates sentenced to be executed by lethal injection asked the Court to order the Food and Drug Administration ("FDA") to take enforcement action against the use of the drugs with which they were to be executed. The FDA Commissioner had refused to take enforcement action because of his conclusion that FDA jurisdiction in the area was unclear and because he did not deem the action to be the best use of his discretionary enforcement authority. *Id.*, 105 S.Ct. at 1652. Throughout the court proceedings, the FDA claimed that its exercise of enforcement discretion was unreviewable.

After concluding that there was no expressed congressional intent to preclude judicial review so as to trigger 5 U.S.C. § 701(a)(1) (no review when "statutes pre-

clude judicial review"), the Court turned its focus to Section § 701(a)(2) (no review if "agency action is committed to agency discretion by law"). The Court explained that this section applies if the exercise of discretion is such that "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 1655. Applying this standard to agency decisions not to take enforcement action, the Court created a rebuttable presumption that such decisions are unreviewable. Although there continues to be a "strong presumption" that other agency action is reviewable, *id.*, *Chaney* established the opposite presumption when decisions not to take enforcement action are involved. In those cases, the presumption is only rebutted "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 1656. The reason for this shift in the presumption, the court explained, is the long recognized "general unsuitability for judicial review of agency decisions to refuse enforcement." *Id.*

The presumption of nonreviewability created in *Chaney* and its corollary requirement of a heightened degree of discernible standards to rebut the presumption of nonreviewability is a reflection of two factors: Congress' likely intent in giving an agency enforcement discretion, and judicial recognition of the limited capacity of courts to review these types of decisions. Professor Davis has explained that:

All administrative discretionary action can theoretically be lined up on a scale from discretion that courts are clearly unqualified to review to discretion they are clearly qualified to review. At one end is subject matter that is the grist of judicial mills and at the other end is subject matter for which legal training and judicial experience do not provide qualification.... The problems that are troublesome are near the middle of the scale. For instance, near the middle is the question whether or when discretion not to enforce should be reviewable.

---

**12.** Appellees raised this issue in a cross-appeal to this court.

5 K. Davis, *Administrative Law Treatise* 308 (2d ed. 1984). Since decisions not to take enforcement action are difficult subjects for judicial review, it is reasonable to require some extra degree of substantive guidance to give the court a focus and basis for its review.

█ This requirement of an amplified level of discernible standards controlling the agency's discretion is not applied, however, where agency action not analogous to enforcement decisions is involved. In those cases the presumption strongly supports *reviewability*, and thus, review is available unless Congress affirmatively commits the action to discretion in a manner that makes review not feasible. See *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 1510–1511, 18 L.Ed.2d 681 (1967) ("only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review").

Of course, the strong presumption of reviewability of typical agency action is not absolute. Some agency action is of a kind that the courts inherently can play no legitimate role in reviewing it. As the Seventh Circuit has noted, *Chaney* simply reaffirmed

> the recognized position that § 701(a)(2) applies in certain circumstances where courts are unqualified to decide whether an agency has abused its discretion.... *Chaney* added to the list of agency actions unsuitable for judicial review, such as State Department action in foreign affairs, and Federal Reserve Board decisions setting interest rates, the class of agency nonenforcement decisions.

*Cardoza v. Commodity Futures Trading Comm'n*, 768 F.2d 1542, 1549 (7th Cir. 1985).

█ The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). While the absence of clear statutory guidelines might at times hamper a court's ability to deem agency action contrary to law, it need not always do so. Even when there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal.[13] If the agency action is found not to be reasonably consistent with this goal, then the courts must invalidate it. The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the "committed to agency discretion by law" exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised.

Moreover, the agency itself can often provide a basis for judicial review through the promulgation of regulations or announcement of policies. Once an agency has declared that a given course is the most effective way of implementing the statutory scheme,[14] the courts are entitled to closely examine agency action that departs from this stated policy. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 40–44, 103 S.Ct.

---

**13.** "In examining congressional enactments for evidence of 'substantive priorities' governing enforcement discretion, courts should perform their traditional roles of identifying statutory goals and of considering the 'background understandings' that inform the substantive statute. These sources may often supply sufficient 'law to apply' ..." *The Supreme Court, 1984 Term,* 99 Harv.L.Rev. 120, 275 (1985).

**14.** "A 'settled course of behavior embodies the agency's informed judgment that, by pursuing

that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865–2866, 77 L.Ed.2d 443 (1983) (quoting *Atchison, Topeka & Santa Fe Railroad Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807–808, 93 S.Ct. 2367, 2374–2375, 37 L.Ed.2d 350 (1973)).

2856, 2865–2867, 77 L.Ed.2d 443 (1983); *Advanced Micro Devices v. CAB*, 742 F.2d 1520, 1540, 1542 (D.C.Cir.1984). Similarly, courts have a clear role to play in ensuring that an agency's practical implementation of its program is consistent with its own declared intentions and goals. Courts often have invalidated agency action because it simply did not comport with standards of rational decisionmaking given the agency's uncontested goal. See generally *Telocator Network of America v. FCC*, 691 F.2d 525, 537 (D.C.Cir.1982) (court must consider whether factors agency considered ' "could lead a reasonable person to make the judgment that the Agency has made' ") (quoting *NAACP v. FCC*, 682 F.2d 993, 998 (D.C.Cir.1982)). Obviously, the lack of statutory guidelines has little effect on the court's ability to carry out this function. See *Bowman Transportation, Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (court considers "whether decision was based on a consideration of relevant factors and whether there has been a clear error of judgment") (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

■ These examples serve to demonstrate that, even without specific statutory guidelines controlling the exercise of discretion, courts have a meaningful role to play in reviewing agency action. The "committed to agency discretion" provision is " 'a very narrow exception' ". *Heckler v. Chaney, supra*, 105 S.Ct. at 1655 (quot-

ing *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 410, 91 S.Ct. at 820); *Gillis v. United States Department of Health and Human Services*, 759 F.2d 565, 576 n. 17 (6th Cir.1985); *Greenwood Utilities Comm'n v. Hodel*, 764 F.2d 1459, 1464 (11th Cir.1985). The requirement of a heightened level of discernible standards controlling discretion to rebut the presumption of nonreviewability applicable in decisions not to take enforcement action must not be applied outside of that context. To do so, would be to frustrate Congress's clear intention, and the long tradition, of allowing judicial review when it can carry out an effective function.

b. *The Case at Bar*

■ We agree with the District Court's conclusion that the presumption and the corollary heightened requirement created by *Chaney* do not apply in this case. The action challenged here shares virtually none of the characteristics that led the Court in *Chaney* to apply a presumption of nonreviewability instead of the normal presumption that agency action is reviewable.

In *Chaney*, the FDA had simply declined to take action to pursue possible violations of a statute. Since an agency generally cannot act against each and every violation, only the agency can balance all of the various factors in deciding how to expend its limited resources. Here, by contrast, the agency itself had committed the funds in question to renovate the shelter.[15] Re-

---

15. Judge Bork's concurring/dissenting opinion maintains that we are focusing on a "non-issue" by addressing the government's decision to withdraw the $2.7 million obligated to repair the Second and D Streets shelter. Instead, he contends, we should focus only on the plaintiffs' request that we enforce the government's original pledge to make a model shelter, and as to that action, there is clearly no law to apply. We do not think the complicated scenario beginning with the complaint and progressing through the District Court proceedings including a remand to the agency for notice and comment on its announced intention to close the shelter and rescind its $2.7 million obligation, closely related actions in their own right, can so easily be characterized. The District Court's decision itself focused on the agency's decision to allocate

the monies elsewhere and close the shelter and it is that decision we are reviewing. Indeed, appellees have themselves maintained throughout that the $2.7 million commitment was sufficient to redeem their original pledge, and it was only after CCNV refused its help that the government moved to close the shelter. Thus, a realistic view of the course of this litigation leads us to focus on the government's rescission of the $2.7 million commitment and the resultant decision to close the shelter as the critical decisions on review.

As to CCNV's contention that the agency's commitment to create a model shelter constituted a decision to spend far more than $2.7 million, we agree with Judge Bork that there is no law to apply. Since the alleged commitment was not tied to any specific statute or program,

viewing the rescission, therefore, does not implicate the concern that the court should not force the agency to funnel its efforts in any one direction. Rather, the court is simply ensuring a limited degree of fidelity to the agency's own decision how to use its resources. Cf. *California Human Development Corp. v. Brock,* 762 F.2d 1044, 1048 n. 28 (D.C.Cir.1985) (*Chaney* does not bar review of reasonableness of agency action even if the agency was under no initial duty to undertake it).

The Court in *Chaney* also reasoned that decisions not to take enforcement action generally do not involve exercise of *"coercive* power over individual's liberty or property rights, and thus d[o] not infringe upon areas that courts are called upon to protect."* 105 S.Ct. at 1656 (emphasis in original). By contrast, rescissions of commitments, whether or not they technically implicate liberty and property interests as defined under the fifth and fourteenth amendments, exert much more direct influence on the individuals or entities to whom the repudiated commitments were made.

The Court in *Chaney* also distinguished the case before it from one where the agency takes affirmative action since "when an agency *does* act to enforce, that action itself provides a focus for judicial review." *Id.* (emphasis in original). Apparently, the Court was concerned that judicial review of agency non-action would necessitate a focusless evaluation of agency policy and priorities—a role for which courts are not suited. By contrast, the Court explained, when there is a specific affirmative action to be reviewed, the reviewing court can adequately focus on the limited issue at hand. Rescissions of prior obligations clearly fall into the "focused action" category.

Finally, the Court in *Chaney* pointed to the similarities between an agency's decision not to take enforcement action and "the decision of a prosecutor in the executive branch not to indict—a decision which

has long been regarded as the special province of the Executive Branch, inasmuch as it is the executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.' U.S.Const., Art. II, § 3." *Id.* at 1656. Obviously, this same similarity does not exist between a prosecutor's decision not to indict and an agency's decision to rescind a commitment.

Review of the factors described in *Chaney* demonstrates that the decision being challenged here is not at all similar in relevant respects to the decision challenged in *Chaney.* Thus, rather than beginning with a presumption of nonreviewability which must be rebutted by a somewhat heightened level of discernible standards controlling discretion, we begin with a presumption of reviewability, which is only rebutted by an affirmative showing that the statute's allocation of discretion is so broad that the courts simply have no standards to apply.

The question of whether there exists law to apply focuses on the particular allegations of the plaintiff. See Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney,* 52 U.Chi.L.Rev. 653, 658–659 (1985). In this case, CCNV has challenged the agency's action as arbitrary and capricious and an abuse of discretion. It alleges, *inter alia,* that the agency made its decision to rescind its obligation based on an impermissible and irrelevant factor—animosity toward CCNV. See Brief for Appellants at 20, 23. Moreover, CCNV alleges that the agency's action must be invalidated because it was based on reasons that were not at all supported by fact. *Id.* at 17–28.

There is nothing about these challenges that convinces us that the court lacks manageable standards to deal with the issues raised. Of course, the allegation that the agency considered impermissible factors presupposes that some factors are impermissible. It is possible to contemplate a statute so broad in its allocation of

we are unable to discern any manageable guidelines controlling the agency's discretion vis-a-vis its subsequent treatment of the model shelter

announcement. By contrast we do find manageable limits regarding the $2.7 million allocation. See text *infra* 47–49.

discretion that no factors—other than unconstitutional ones—are off limits. For example, were a statute to provide the President with funds to "use as he wishes" it is hard to imagine that there could be any impermissible or irrelevant factors. The statute under which the Secretary made the original commitment to renovate the shelter, however, is not nearly as broad and standardless.

42 U.S.C. § 9910 authorizes the Secretary to make grants, loans, or guarantees provided that they are "related to the purposes" of the Community Services Block Grant Act.[16] While this limitation might not be specific enough to rebut the presumption of nonreviewability applicable in enforcement cases under *Chaney*, we think that it provides sufficient guidance given the fact that a strong presumption of reviewability controls here. When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account. It would clearly be impermissible, for example, for the agency to rescind a commitment because it develops personal animus toward the original recipient or because the Secretary's friend has become a member of the new beneficiary organization. Similarly, the Administrative Procedure Act would require us to invalidate the Secretary's action were it to be based on factual determinations that are

without adequate foundation. See 5 U.S.C. § 706(2). Thus, given the fact that the statute limits the uses for which the funds can be used, we see no barrier to our assessing whether the agency's decision was based on factors that are relevant to this goal.

A second factor that reinforces our conclusion is the effect of the agency's original commitment of funds to renovate the shelter. In making that commitment, the Secretary presumably determined that the grant was the best way to fulfill the purposes of the Community Services Block Grant Act. In rescinding that determination, the Secretary was clearly compelled to give adequate reasoning for the dramatic change of course. This court has long held that an agency's change in direction from a previously announced intention is a danger signal that triggers scrutiny to ensure that the agency's change of course is not based on impermissible or irrelevant factors. See *National Black Media Coalition v. FCC,* 775 F.2d 342, 354–356 and nn. 16–17 (D.C. Cir.1985); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 812–813 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); see generally *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., supra,* 463 U.S. at 40–44, 103 S.Ct. at 2865–2867. As the District Court correctly stated, this requirement is not limited to officially promulgated regulations. See *Massachusetts Fair Share v. Law Enforcement As-*

---

**16.** The "purposes" of the Act can be discerned by examining the legislative history, as well as the types of expenditures authorized by the other provisions of the Act. The Senate Report demonstrates that one of the purposes was to fund "services and activities that will have a 'measurable and potentially major impact' on the causes of poverty," S.Rep. No. 484, 98th Cong., 2d Sess. 4, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4847, 4850, and to "provide assistance to those Americans struggling to break the cycle of poverty." *Id.* at 14, *reprinted in* U.S.Code Cong. & Ad.News at 4856. Similarly, the Act specifically authorizes use of funds "to provide activities designed to assist low-income participants including the elderly poor ... to obtain and maintain adequate housing and a

suitable living environment." 42 U.S.C. § 9904(c)(1)(B)(iv). The Act also authorizes allocations "on an emergency basis for the provisions of such supplies and services, nutritious foodstuffs, and related services, as may be necessary to counteract conditions of starvation and malnutrition among the poor." 42 U.S.C. § 9904(c)(1)(C). While these specific provisions relate to funds allocated to states, they nonetheless serve as evidence that one of the purposes of the Community Services Block Grant Act was to provide aid to the homeless. At the same time, they also demonstrate that not every use would be consistent with the limited purposes of the Community Services Block Grant Act. See generally 42 U.S.C. §§ 9901–9912; see also *infra* note 21.

*sistance Administration*, 758 F.2d 708, 711 (D.C.Cir.1985) ("precept is rooted in the concept of fair play and in abhorrence of unjust discrimination, and its ambit is not limited to rules attaining the status of formal regulations"). Given the shift in policy we have no difficulty in recognizing the traditional role that courts have always played in ensuring that the agency is continuing to act in the way that *it* considers to be the best implementation of its statutory mandate.

## IV. REVIEW OF THE DECISION TO CLOSE THE SHELTER

■ The government's rescission of its well publicized commitment to renovate the Second and D Streets shelter is subject to judicial review to ensure that, given the guidance of the Community Services Block Grant Act, it was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As enunciated by the Supreme Court in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), to satisfy these standards an agency must "articulate a satisfactory explanation" for any change of course from previously stated policies or intentions. This requirement is more demanding than "that which may be required when an agency does not act in the first instance." *Id.;* see also *National Black Media Coalition v. FCC*, 775 F.2d 342, 354–356 (D.C.Cir.1985); *Airmark Corp. v. FAA*, 758 F.2d 685, 691–692 (D.C.Cir.1985); *Massachusetts Fair Share v. Law Enforcement Assistance Administration*, 758 F.2d 708, 711 (D.C.Cir. 1985); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). Upon review, the court must invalidate agency action if it finds

that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., supra*, 463 U.S. at 43, 103 S.Ct. at 2867. In short, the court must ensure that changes in policy are carried out "for rational reasons that are sufficiently explained." *Ventura Broadcasting Co. v. FCC*, 765 F.2d 184, 190 (D.C.Cir.1985).

Appellants maintain that the decision to close the shelter was contrary to the purposes of the Community Services Block Grant Act as there was no basis for the agency's stated belief that the closing would be coupled with the location of adequate alternatives. Appellants also contend that the government's decision was based on an impermissible and irrelevant factor: personal animus toward CCNV. Our review of the record confirms that the agency did not act out of personal animus toward CCNV or without adequate factual support, but rather acted for well articulated reasons that were neither arbitrary nor capricious.

The government's reasons for reversing the commitment to renovate and deciding instead to close the shelter were articulated by Undersecretary Baker in his July 31, 1985 memorandum. See J.App. 110–112. The first reason cited was the deplorable condition of the facility which, according to the Undersecretary, rendered it unfit for use as a shelter for the homeless. Given the statutory objective of providing "adequate housing and a suitable living environment" to the homeless [17] and the well documented evidence of deplorable conditions at the shelter,[18] we cannot say that this

---

17. 42 U.S.C. § 9904(c)(1)(B)(iv) (1982).

18. HHS concluded that conditions in the shelter presented a "substantial and immediate threat" to the health and safety of the shelter residents. This conclusion was based, in part, on a Public Health Service inspection which documented

the seriously deteriorated condition of the "grossly inadequate" plumbing and sanitation facilities; the adequacy of the space for from 550–650 individuals, the evidence of poor housekeeping, cleaning and maintenance; the overwhelming infestation by roaches; evi-

invocation of the health and safety interests of the occupants was impermissible. Moreover, Undersecretary Baker's reliance on this consideration cannot be faulted for failing to take account of the danger to the homeless that would result from closing the shelter as the agency coupled its decision to close with a commitment to locate alternative facilities offering conditions superior to those at the Second and D Streets facility.[19] Consistent with the agency's commitment to locate alternatives, closure of the shelter has been repeatedly delayed as the Anacostia and Florida Avenue facilities were renovated and staffed.

The second basis for the decision was the lack of a suitable operator willing to commit itself to maintaining the facility. Appellants characterize the agency's reliance on this consideration as evidence that the agency acted out of animus toward CCNV.[20] This contention fails to take into account CCNV's announcement that it was unwilling to continue operating the shelter unless the government agreed to meet CCNV's renovation demands. This ultimatum forced the government's hand. The District government had repeatedly ignored calls for assistance. Despite efforts to identify local community groups that might step into the breach, no suitable op-

erator had been identified. HHS was therefore faced with the prospect of spending $2.7 million to renovate a facility no one was willing to operate. This risk, combined with other factors such as the fast approach of winter and the doubt as to whether renovations could be completed prior to the onslaught of cold weather, led the agency to seek alternatives to continued use of the Second and D Streets facility.

The third reason cited by Undersecretary Baker was the perceived inappropriateness of federal involvement with the operation of the shelter. Without commenting on the political issue of whether the problem of homelessness is best addressed at the federal or local level, it is not difficult to discern the basis for the Undersecretary's concern in this instance. CCNV had always operated the facility and was threatening to abandon it. No other operator had surfaced to step into CCNV's shoes and there existed a real threat to the welfare of the occupants of the shelter. At the same time, the Community Services Block Grant Act, which was to fund the federal role in the shelter project, provided for only limited expenditures on a short-term basis.[21] Thus, it was reasonable for

---

dence of earlier rat infestation; the presence of insects because of the lack of screened exterior openings; inadequate lighting; lack of ventilation in interior sleeping rooms; heavily soiled sleeping cots, blankets and pillows; additional sanitary problems caused by the use of cats to control rodents; the serious disrepair and deterioration of the building; and other examples that the building lacks the most elementary health and safety features. J.App. 81. GSA reported that much of the damage had occurred after CCNV began operation of the shelter. J.App. 80–81.

19. We therefore need not address whether, in the absence of a commitment to locate alternatives, a decision to close a shelter providing necessary services which was premised on the health of shelter residents would be inconsistent with the purposes of the Community Service Block Grant Act or otherwise arbitrary or capricious.

20. An agency decision prompted by personal animus would run afoul of the requirement that agencies act in a reasoned, nonarbitrary man-

ner. See, e.g., Kent Farm v. Hills, 417 F.Supp. 297, 301 (D.D.C.1976).

21. Section 508 of the Fiscal Year 1985 Department of Labor, Health and Human Services, and Education and Related Agencies Appropriation Act (which includes the funds in question), provides that "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year...." Pub.L. No. 98–619, 98 Stat. 3305, 3333 (Nov. 8, 1984). This limitation indicates that Congress did not wish the Secretary to fund any projects that would require long-term federal funding. Rather, the Secretary was expected to make a number of one-time grants prior to the end of the fiscal year.

Moreover, an expanded federal role in operating the shelter might have compromised the agency's ability to utilize the limited Community Services Block Grant Act funds allocated pursuant to Section 9910 for the broad range of purposes envisioned by Congress. Rather than directing the Secretary to use these funds for the single policy goal of ameliorating the lack of

Undersecretary Baker to be concerned about assuming an expanded long-term role of directly administering the facility. The agency's predicament was reasonably resolved through the commitment to locate suitable alternatives.

The fourth and fifth reasons identified by Undersecretary Baker concern the need to eliminate two factors the agency viewed as impeding the identification of alternative shelter facilities: the pendency of this litigation and the continued operation of the Second and D Streets shelter. The record contains no substantiation for the agency's speculation that continued litigation discouraged potential shelter providers from becoming involved. Although we reject this reason, its articulation does not nullify the decision in view of the other factors supporting the agency.

The weight to be given to the agency's belief that only immediate and decisive action to close the shelter would spur the necessary cooperation is not easily determinable. In the absence of the government's commitment to locate alternatives, we would have serious doubts about this calculated brinkmanship. But given this commitment, we cannot hold the agency's attempt to break the political logjam to be unreasonable.

## V. THE DISTRICT COURT'S AUTHORITY TO CONDITION CLOSURE ON DEVELOPMENT OF ALTERNATIVES

■ Appellees challenge the authority of the District Court to require the development of "appropriate interim and long range plans to eliminate homelessness in the Nation's Capital...." *Robbins v. Rea-*

gan, *supra* note 7, at 2, J.App. 59. Appellees assert that the District Court was without authority to place obligations on the agency beyond those it voluntarily assumed. Appellees' Brief at 41–43. Although we appreciate the District Court's desire to see the problem of homelessness eliminated, we know of no authority that would have authorized it to impose such a requirement in this action while dismissing all of the claims before it. But to the extent the order required the agency to see that alternatives to the Second and D Streets shelter were developed, the order incorporated the agency's chosen course of action as reflected in Undersecretary Baker's memorandum. That part of the order was an appropriate exercise of the District Court's jurisdiction to condition dismissal on the agency's fulfillment of the obligations upon which the court relied in holding the agency decision to be rational. The District Court's order is affirmed to the extent it required location of substitute shelter facilities for the inhabitants of the Second and D Streets shelter.

## VII. THE PROMISSORY ESTOPPEL CLAIM

In addition to appealing the District Court's dismissal of their APA challenge, appellants have again raised their claim that appellees are barred from closing the shelter by virtue of the doctrine of promissory estoppel.[22] The District Court dismissed the promissory estoppel claim without reaching the merits, ruling that appellants had failed to address this issue in opposing the government's motion to dismiss and had therefore conceded the claim under Local Rule 1–9(d).

Rule 1–9(d) provides:

services for the homeless in the District of Columbia, Congress directed the Secretary to consider allocating funds for "technical assistance and training programs in rural housing and community facilities development; assistance for migrants and seasonal farm workers; and national or regional programs designed to provide recreational activities for low-income youth." 42 U.S.C. § 9910(a)(2)(D), (E), (F) (1982). The diverse programmatic goals that the Secretary is directed to consider in administering the Act coupled with the short-term nature of that authority provide strong support for

the agency's decision to change course given the likelihood that the government might otherwise have been required to assume sole responsibility for the long-term operation of the shelter.

**22.** That doctrine operates to require enforcement of promises that have induced reasonable reliance by the promisee where enforcement is necessary to avoid injustice. See *Granfield v. Catholic Univ.*, 530 F.2d 1035 (D.C.Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

Within ten days of the date of service or such other time as the court may direct, an opposing party shall serve and file a statement of points and authorities in opposition to the motion, together with a proposed order. If such opposing statement is not filed within the prescribed time, the court may treat the motion as conceded.

Appellants did in fact file a memorandum in opposition to appellees' motion to dismiss but failed to address the promissory estoppel claim. The District Court concluded that appellants had thereby "effectively abandoned this count, and the Court must treat it as conceded." *Robbins v. Reagan*, *supra* note 6, at 28, J.App. 38. Appellants challenge this ruling by asserting that the issue was thoroughly covered in the Memorandum of Amici Curiae, that the arguments of amici were relied upon by counsel in an August 2 hearing, and that a Supplemental Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and in Support of Plaintiffs' Motion for Injunctive Relief listed the promissory estoppel issue as one of several issues of fact remaining to be tried.

We must first determine whether the District Court abused its discretion in dismissing the estoppel claim on this basis. See *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976). In reviewing the District Court's dismissal, this court must consider the circumstances surrounding appellants' failure to comply with Rule 1–9(d). *Camps v. C & P Telephone Co.*, 692 F.2d 120, 124 (D.C.Cir. 1981). "Trial court dismissal of a lawsuit never heard on the merits is a drastic step, normally to be taken only after unfruitful resort to lesser sanctions." *Jackson v. Washington Monthly Co.*, 569 F.2d 119, 123 (D.C.Cir.1977).[23] Dismissal is justifiable to preclude claims when a court is faced with conduct approaching "flagrant bad faith" or "callous disregard." *National Hockey League v. Metropolitan Hockey Club, supra*, 427 U.S. at 643, 96 S.Ct. at 2781 (application of Fed.R.Civ.P. 37).

■ In light of the circumstances surrounding the flurry of motions below, including the briefing of the promissory estoppel issue by amici curiae, dismissal of the promissory estoppel claim under Rule 1–9(d) was not appropriate. All proceedings were expedited, resulting in over sixty filings in the course of six weeks. More importantly, counsel for plaintiffs withdrew, and new counsel was hastily substituted. In this context, where appellants' conduct could hardly be considered egregious, the District Court abused its discretion in not resorting to sanctions less severe than dismissal.

Appellees contend that even if the District Court erred in relying on Rule 1–9(d), its dismissal of the promissory estoppel claim should not be reversed as that court had no jurisdiction to consider such a claim and that the federal government has not waived its sovereign immunity with regard to liability under this theory. Appellants respond that subject matter jurisdiction exists because the claim arises under the federal common law and that the waiver of sovereign immunity in the APA applies.[24] Appellants maintain that this court should find for them on the jurisdiction and sovereign immunity issues as a matter of law.

In the past year this court has twice declined to rule on the "novel and difficult issues concerning subject matter jurisdiction and waiver of sovereign immunity" presented by claims of promissory estoppel against the federal government. *Professional Managers' Ass'n v. United States*, 761 F.2d 740, 745 n. 4 (D.C.Cir.1985); *National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455, 466 (D.C.Cir.1984). Only one United States Court of Appeals

---

**23.** Although the District Court dismissed only one claim on these grounds, we think the dismissal of a potentially meritorious claim is a severe enough sanction so that it should only be applied to egregious conduct.

**24.** The APA waives sovereign immunity as to claims that "an agency or officer of the United States acted or failed to act in an official capacity." 5 U.S.C. § 702 (1982).

has in fact ruled on the sovereign immunity issue. See *Jablon v. United States,* 657 F.2d 1064, 1070 (9th Cir.1981) (holding that "the government has not waived its sovereign immunity with regard to a promissory estoppel cause of action"). We have concluded that the unique circumstances of this case make it an inappropriate vehicle for tackling these questions for the first time.[25] Because of the expedited nature of the proceedings in both courts, we have not had the benefit of adequate briefing from the parties.[26] The delay in the issuance of a decision that would result from full consideration of these issues would not result in any benefit to appellants, but rather would likely cause further harm to the inhabitants of the Second and D Streets shelter.

The court is convinced from the record that appellees would have been granted summary judgment had the District Court examined the merits of the promissory estoppel claim. In order to succeed on a promissory estoppel claim appellants would have to prove: (1) the existence of a promise; (2) that the government expected appellants to rely on the promise by taking definite and substantial action or forbearing from such action; (3) actual detrimental reliance by appellants; and (4) that the promise must be enforced to avoid injustice. *Granfield v. Catholic University, supra* note 16, 530 F.2d at 1039; see also Restatement (Second) of Contracts § 90 (1981).

We find it difficult to imagine how residents of the shelter relied on the government's promise to their detriment by choosing to live at the Second and D Streets facility instead of living in the streets. Moreover, it is clear for two reasons, that enforcement of the alleged promise is not necessary to avoid injustice: this is not a case where, absent enforcement, the promisor (here the government) will be unjustly enriched and, as stated above, it is difficult to discern why a lack of enforcement will result in harm to the residents. See *Donovan v. United States Postal Service,* 530 F.Supp. 872, 893 (D.D.C.1981) (citing *Oates v. Teamsters Affiliates Pension Plan,* 482 F.Supp. 481, 489 (D.D.C.1979)). The government has committed substantial resources to the creation of alternative shelters in an effort to create conditions superior to those existing at Second and D Streets. As such, there exists no justification for a remand of this case on the promissory estoppel issue.

We thus decline to rule on the jurisdictional issue involved in the promissory estoppel claim but uphold the District Court's dismissal of it, albeit on different grounds.

## VII. CONCLUSION

We find the District Court had jurisdiction under 28 U.S.C. § 1331 to review appellants' APA claims and that the agency action in question was reviewable under the APA. The decision to close rather than renovate the shelter at Second and D Streets was not arbitrary or capricious. Therefore, appellants are not entitled to an order compelling appellees to complete the repairs.[27] The conditional dismissal of appellants' claims is affirmed to the extent it required appellees to provide adequate alternatives for the inhabitants of the Second and D Streets shelter. Finally, although the District Court improperly dismissed appellants' promissory estoppel claim under Local Rule 1–9(d), we think dismissal is appropriate for other reasons. It is

*So ordered.*

---

**25.** See, e.g., *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1101 (D.C.Cir.1985) (appellate court may defer resolution of threshold issue where decision on the merits is clearly fore-ordained); *Adams v. Vance,* 570 F.2d 950, 954 n. 7 (D.C.Cir.1977) (collecting cases).

**26.** See *Edwards v. Carter,* 580 F.2d 1055, 1057 (D.C.Cir.) (per curiam), *cert. denied,* 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978).

**27.** It is also clear that appellants are not entitled to an order compelling the government to winterize the Second and D Streets shelter, and appellants' October 29, 1985 Motion to Revise Order is therefore denied.

BORK, Circuit Judge, concurring in the judgment in part and dissenting in part:

Appellants Robbins and others appeal from a district court order dismissing their complaint. Appellants, plaintiffs below, sued to enforce a promise by Secretary of Health and Human Services Margaret Heckler to convert a federally-owned building at Second and D Streets into a "model shelter" for the homeless of the District of Columbia. The federal appellees cross appeal from the district court's order conditioning the dismissal and the closing of the Second and D Streets shelter upon the finding of alternative shelter arrangements.

My colleagues have decided a case that was not presented to us. The obtrusive truth is that the district court lacked jurisdiction to decide this case and hence lacked jurisdiction to issue its order. We, in turn, lack jurisdiction over the appeal, other than jurisdiction to vacate the order. For that reason, the per curiam opinion is in reality little more than a compendium of controversial dicta.

Given the majority opinion's extensive recitation of the facts, I need restate only a few crucial ones. The Community for Creative Non-Violence ("CCNV") has been operating a shelter for homeless people in a building owned by the federal government located at Second and D Streets in the District of Columbia. After disputes about the shelter, the Secretary of Health and Human Services ("HHS"), in November, 1984, informed CCNV that the President had requested that HHS make the building "into a model physical shelter to house the homeless in the District of Columbia." The Secretary specified seven types of renovation that would be undertaken, and, on May 30, 1985, HHS formally authorized the expenditure of $2.7 million from funds appropriated for the Community Services Block Grant Act. CCNV found that amount inadequate, refused to let the renovation proceed, and, with other plaintiffs, filed this suit to compel the federal government to create a "model shelter." HHS rescinded its decision to spend $2.7 million on renovations, giving the reasons recited in the majority opinion. Maj. op. at 24–28.

### I.

It is important to note that appellants did *not* sue to force the government to spend the $2.7 million on renovations. CCNV had explicitly rejected those renovations. Appellants did *not* challenge the withdrawal of the $2.7 million commitment. They sued to enforce the November, 1984, promise to create a "model shelter," which, on anybody's calculations, would cost much more. Yet the majority inexplicably addresses the commitment CCNV is not seeking to enforce and ignores the commitment it does seek to enforce.

The majority struggles to make the $2.7 million commitment the subject of this lawsuit but that struggle is unavailing. The majority opinion attempts to justify what is done here by saying "[t]he District Court's decision itself focused on the agency's decision to allocate the monies elsewhere and close the shelter and it is that decision we are reviewing." At 46 n. 15. That is precisely right. And since it is absolutely clear that the district court focused on an issue not presented by the plaintiffs, and, indeed, rejected by the plaintiffs, the way to review the district court's decision is to declare that the district court lacked jurisdiction over the issue the plaintiffs actually presented and to vacate the district court's order. The fact that the district court reached out for an issue nobody was litigating [1] provides no excuse for our doing the same thing.

---

1. The mood in which the district court approached the question of what issues were before it, and its own powers, is sufficiently indicated by the following passage, by no means the only one of similar tone, from its opinion:

[T]he Court will entertain written applications ... for the appointment of a Special Master for the purpose of ensuring that the federal government assists in locating proper health care and shelter providers and does what it has now promised, (as a result of this lawsuit). In this regard, the Court will use every power which it may have at its disposal in order that the residents of the Second and D Street, N.W., building are provided in other facilities with the resources they need to live

The majority attempts to find support for its assumption of power by then noting that "appellees have themselves maintained throughout that the $2.7 million commitment was sufficient to redeem their original pledge [of a model shelter], and it was only after CCNV refused its help that the government moved to close the shelter. Thus, a realistic view of what the parties argued, and the district court decided over the course of this litigation leads us to focus on the government's rescission of the $2.7 million commitment and the resultant decision to close the shelter as the critical decisions on review." At 46 n. 15. Far from being "realistic," this view of what is presented to us is a piece of judicial fiction. The appellees did assert that the $2.7 million commitment was sufficient to redeem the pledge of a "model shelter." But appellants utterly rejected that view and sued for an order that a "model shelter" be built. Since appellants, plaintiffs below, never once challenged the rescission of the $2.7 million commitment, it is impossible to understand what empowered the district court, or now empowers this court, to review that rescission.

The amended complaint does not once complain of HHS's rescission of the $2.7 million commitment. Instead, that complaint makes it as clear as language can that *only* the "model shelter" commitment is sought to be enforced. First Amended Complaint at para. 1, J.A. at 249 ("This suit asks the Court to compel the Defendants to honor their commitment to transform a federally-owned shelter for the homeless into a 'model' facility."); para. 29, J.A. at 259 ("[T]his suit was filed to require defendants to honor their commitment to renovate the shelter into a 'model.' ").[2]

If all this is not enough to prove that the district court had before it only a suit to compel the creation of a "model shelter" and not to prevent the rescission of the $2.7 million commitment, the latter relief, which the majority chooses to view as the issue before us, is explicitly rejected by the complaint. Paragraph 31 alleges that "[t]he GSA plan [designed to implement the $2.7 million commitment] does not satisfy the specific conditions of the commitment made by President Reagan and Secretary Heckler, and it does not satisfy the overall commitment to renovate the shelter to be a 'model physical shelter ... with special attention to preserving dignity of the homeless....' ... What defendants propose to do would be unacceptable to any respon-

as decent human beings so that they may receive treatment for their various problems, such as alcohol and drug addiction, and other mental health problems. The Court also realizes that these people need food and assistance to care for their nutritional deficiencies.

The Court recognizes that many of these people require counselling, job training, and have a myriad of other needs....

This effort will require governmental leadership from top to bottom, starting at the White House, in a multitude of disciplines that are involved. But the Court expects that the captains of industry, commerce, banking, hospitals, skilled nursing homes, and other health care providers, and the medical, psychiatric, and legal professions will all be asked and urged in the strongest possible terms to find and implement a *solution* to this disgraceful problem. No more delay can be tolerated in the face of this human misery. Thus, the Court will be watching and waiting to see what the President of the United States and his associates in the government, as well as the leaders of the private sector, do. The court believes it will be enough, but, if not, the Court stands ready to consider the ap-

pointment of a Special Master, who will be a nationally recognized expert in this multi-disciplinary problem. As currently envisioned, the Special Master would report on the conduct of those with the resources and expertise to solve and eliminate this problem—not to exacerbate it through press conferences and the hurling of recriminations, all at the expense of the truly needy. Only our nation's conscience and the residents of this building, who might otherwise be on the grates and in the parks of the nation's capital, will be harmed further if a solution is not achieved. J.A. at 13–14 (footnotes omitted).

**2.** The record is replete with other examples. *See* paras. 31–33, 37–40, J.A. at 259–61, 263–65. The prayer for relief asks that the court declare the closing of the shelter a violation of "defendants' commitment to transform the shelter into a model" and therefore a violation of the Administrative Procedure Act. *Id.* at para. 48, J.A. at 267. It also asks that defendants be enjoined to honor the November, 1984, commitment, which was to create a model shelter. *Id.* at para. 49, J.A. at 267–68.

sible shelter provider. In no sense could the defendants' proposal be considered a 'model.' " J.A. at 260–61.[3]

The complaint thus makes clear beyond quibble that the $2.7 million commitment is not in any way the subject of this lawsuit. The creation of a "model shelter" is the subject of this lawsuit, and the $2.7 million commitment is rejected as not in any way related to the commitment sued upon.

Given the majority's remark that the "complicated scenario" of these proceedings cannot be "so easily characterized as a case only about a model shelter," it may be thought that perhaps the case has somehow changed since the complaint. Whatever the issue originally raised, perhaps this case had metamorphosed into a challenge to the rescission of the $2.7 million commitment by the time the appeal reached us. Nothing could be further from the truth. The Statement of the Issues in appellants' brief lists as questions for this court's review the decision to close the Second and D Streets shelter and appellees' failure to renovate the shelter as a "model shelter." No issue about the rescission of the $2.7 million commitment is listed as presented to us. Appellants' Statement of the Case says, "CCNV took the position that the government's $2.7 million renovation plan utterly failed to meet the President's November, 1984 commitment to establish a model shelter and, on June 17, 1985, filed this suit to compel appellees to live up to their commitment." Brief for Appellants at 5 (footnote omitted). The brief argues

that none of the reasons the government gave for deciding to close the shelter "provides a basis for walking away from [the 'model shelter'] commitment made in November, 1984 by the President and the Secretary of HHS." Id. at 13. "Because appellees have made no progress toward implementing the commitment made in November, 1984 to develop the Second Street shelter as a model shelter, and because they have spent the last several months attempting to escape that commitment, the proper remedy" is an order requiring "appellees to renovate the Second Street shelter as a model shelter for the homeless." Id.[4]

At oral argument, counsel for appellants made it clear that a "model shelter" was sought, not the renovations possible with $2.7 million. In fact, only reluctantly, and upon being pressed by the court, did counsel say that CCNV would continue to operate the shelter if only $2.7 million was provided. But it was very clear that this sum was not what this lawsuit was about.

I have gone into this matter at length in order to show that the one issue that was never raised by the complaint and that was never brought to us for review was the government's rescission of its commitment to spend $2.7 million on the Second and D Streets shelter. That is not now and never has been the issue in this case. Yet it is the one issue that the majority absolutely insists upon deciding. I cannot imagine a legitimate reason for doing so.

3. Indeed, the complaint's rejection of anything but the "model physical shelter" promised in November, 1984, is pervasive. Paragraph 38 states: "What the defendants propose to do to the shelter will not 'create a model physical shelter.' " J.A. at 263. Paragraph 39 states: "In the face of the commitment by President Reagan and Secretary Heckler to 'create a model physical shelter,' defendants have proposed instead to perform inadequate and insufficient work at the shelter, which work does not, under any reasonable definition, constitute compliance with the commitment." J.A. at 263–64.

4. There is more in appellants' brief that makes it abundantly clear that the Secretary's promise to build "a model physical shelter" was the only subject of the appeal. The first point under

Argument states that the district court erred "in failing to compel defendants to renovate the Second Street shelter as a model shelter." Brief for Appellants at 14. The decision to close the shelter is attacked as inconsistent with the original "model shelter" commitment. Id. at 16. CCNV represented that it was willing to continue operating the shelter "if the shelter is renovated as a 'model shelter,' as promised." Id. at 24. It is possible to go on and on, citing appellants' brief and reply brief, to show that appellants never challenged on appeal the rescission of the $2.7 million commitment but demanded only that the court order the creation of a "model shelter." Brief for Appellants at 28, 29, 36; Reply Brief for Appellants at 2, 5, 6, 9, 12, 13, 14, 18.

Much might be said of the majority's reasoning, and in particular of its attempt to confine *Heckler v. Chaney,* — U.S. —, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), to a narrow rationale, but, since the majority's opinion is an essay on a non-issue, there is no need to do so. In any event, the majority concludes that the appeal should be dismissed, and with that I agree. I turn next to what seems to me the correct reason for dismissing the appeal and the complaint.

## II.

The only controversy actually before this court is whether appellants may maintain a suit to require appellees to create a "model physical shelter structure" and, because of that asserted obligation, may prevent the closing of the Second and D Streets shelter. It is clear that no such suit will lie.

The district court did not have subject matter jurisdiction to hear this lawsuit. Jurisdiction is rested by the majority on 28 U.S.C. § 1331 (1982), which gives district courts jurisdiction over "all civil actions arising under the Constitution, laws or treaties of the United States." This action cannot arise under the laws of the United States because there is no federal law to apply. Appellants challenge the government's action under the Administrative Procedure Act, *see* 5 U.S.C. § 501 *et seq.* (1982), but review is precluded if the challenged action is committed to agency discretion by law, *see* 5 U.S.C. § 701(a)(2) (1982). If the action is so committed, that precludes federal jurisdiction under 28 U.S.C. § 1331 (1982). *See Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977) (holding that federal question jurisdiction of the federal courts under section 1331 is "subject ... to preclusion-of-review statutes created or retained by Congress"). Under *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), the preclusion of judicial review un-

der section 701(a)(2) depends on the question whether the breadth of discretion conferred upon an agency by statute provides a court with no law to apply in a given case. Recently, in *Heckler v. Chaney,* — U.S. —, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), the Supreme Court noted that a court can interfere with an agency's exercise of discretion only where "judicially manageable standards" exist to constrain that discretion. Thus, in any particular instance, a statute that offers no standards to constrain the specific exercise of an agency's discretionary power provides no law for a reviewing court to apply and deprives that court of jurisdiction.

Unless one understands the "no law to apply" standard as relating to the specific allegation at stake in a given challenge, a court could always find some law in the general area of the controversy, and section 701(a)(2) of the Administrative Procedure Act would become a nullity. The inquiry "can be made coherent only by measuring the plaintiff's allegation against the governing substantive statute." *See* Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney,* 52 U.Chi.L.Rev. 653, 659 (1985).

In this case, the substantive statute provides no standards to govern appellants' challenge. The statutory standards to which the majority refers do not apply to the particular allegations made by appellants. The majority relies upon 42 U.S.C. § 9910(a)(2) (1982), which constrains the discretion of the Secretary by limiting the acceptable purposes upon which the Secretary can expend Community Services Block Grant Act funds.[5] The majority's reliance is misplaced. While section 9910(a)(2) does limit the Secretary's descretion in spending the statutory funds, it does so in ways wholly irrelevant to this lawsuit, and appellants have not alleged that the Secretary abused that discretion or transgressed any limits set out in the statute. The provision cited by the majority imposes no substan-

---

**5.** Significantly, the majority has gleaned these purposes in part from 42 U.S.C. § 9904(c)(1)(B)(IV) and (c)(1)(C) (1982), which

the majority concedes to be inapposite insofar as they apply to funds granted to states.

tive constraint on the action actually at issue here, and appellants have nowhere asserted that the refusal to build a "model shelter" violated this provision. The provision cited by the majority cannot make this action reviewable because no one has asked this court to see if it has been transgressed.[6]

If there is law to apply simply because a statute contains criteria that are in no way relevant to the complaint made, the subject matter jurisdiction of federal courts is greatly expanded. That has happened here, and the majority improperly assumes jurisdiction to review the rationality of the Under Secretary's decision to close the shelter. It seems to me clear that, since the statute contains no standards relevant to the case appellants brought, there is no law to apply and that this court lacks "arising under" jurisdiction over the Administrative Procedure Act claims.[7]

### III.

Since the district court had no jurisdiction over this case, it is clear that the order not to close the Second and D Streets shelter must be vacated. But there is an additional reason for that conclusion. That order, as affirmed by this court, is unsupported by any citation of any legal obligation appellees owe to appellants.

After the government announced that it intended to close the Second and D Streets shelter, appellants, on June 26, 1985, filed the amended complaint to enjoin the clos-

ing. The amended complaint alleged that the proposed closing was unlawful because inconsistent with the promise to create a model shelter. Just over a month later, an Under Secretary of HHS approved recommendations in a memorandum dated July 31, 1985, from another government official. One recommendation approved was that the shelter closing be postponed to August 31, 1985, to allow time to make all reasonable efforts to find alternative shelter arrangements. The closing was *not* conditioned upon finding alternative shelter arrangements. The Under Secretary decided that the $2.7 million previously committed to renovations at Second and D Streets should be used in the relocation effort.

Thus, it is clear that appellants did *not* sue to enforce the Under Secretary's adoption of the recommendations set out in the memorandum. They could hardly have done so since the complaint was filed a month before the memorandum existed. The complaint relied entirely upon the 1984 "model shelter" statement. The complaint is explicit about this: the closing was opposed "because it violated the word of a cabinet officer and the President," not because it violated the later policy decision made by the Under Secretary. *See* First Amended Complaint at para. 32, J.A. at 261. Indeed, in paragraph 34 of the First Amended Complaint, CCNV stated that "[d]efendants' proposal to close the shelter and evict the residents is patently violative of the commitment to transform the shelter

---

6. Nor is it clear that the majority is correct in asserting that the APA compels us to review the agency action to see if it is "based on factual determinations that are without adequate foundation." If 5 U.S.C. § 701(a) (1982) precludes judicial review, that must be dispositive.

7. It is argued that the "law to apply" in this case lies in the Secretary's statement that she had been directed to build a "model shelter." No one on this court thinks that this statement, undefined and standing alone, provides law. The majority expressly agrees that there is no law to apply to a demand for a "model shelter" costing far more than $2.7 million. At 46 n. 15. The only criteria by which the court and then this court could define the term "model shelter" would come from the Secretary's

listing of specific renovations and HHS's commitment of $2.7 million to make those renovations. We do not, however, need to reach the question whether those criteria constitute "law to apply" in this case because appellants do not seek to enforce this "law," if it be law. Instead, they sue upon the Secretary's original statement promising "a model physical shelter for the homeless in the District of Columbia." *See* First Amended Complaint at 17–19, J.A. at 263–65. The phrase "model shelter" does not supply what *Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), demands: "judicially manageable standards." Nobody knows what it means and appellants' version, as contained in their architect's plans, illustrates their vision but can hardly be called law.

into a 'model physical shelter structure.' " J.A. at 262.

Yet the majority again addresses an issue not presented and this time upholds the district court's order requiring that alternatives to the Second and D Streets shelter be developed before that shelter could be closed. The majority does so on the notion that the district court could enforce compliance with the agency's own commitments, as formulated in the recommendations the Under Secretary adopted. But the Under Secretary made *no* commitment to appellants; the appellants did *not* sue to enforce anything the Under Secretary decided; and the Under Secretary *did not,* as the district court did, make the closing conditional on the provision of alternative shelter. Each of these defects is fatal to the district court's order. The last mentioned perhaps deserves emphasis. The district court did more than simply enforce the policy adopted by the Under Secretary. That policy did not condition the closing on the provision of an alternative. The lower court, therefore, has by its order added a new term to the policy it purports to enforce. The majority now endorses the district court's action. This constitutes an impermissible judicial intrusion into the administrative process.[8]

From this aspect of today's decision, I dissent.

### IV.

To summarize, I concur in the affirmance of the lower court's dismissal of appellants' complaint but do so on the ground that the district court lacked "arising under" jurisdiction; I dissent from the affirmance of the trial judge's order requiring the government to provide alternative shelter arrangements before closing down the Second and D Streets shelter because there was neither jurisdiction nor any legal basis for that order.

---

**8.** Because the government has provided alternative shelter facilities in Anacostia and on Florida Street, this aspect of the lower court's decision might be moot but for the appellants' contention that these alternative facilities are inade-

quate. *See* Appellants' Motion for Emergency Relief (filed Nov. 20, 1985).

\* Part II of the opinion as well as the last paragraph were vacated.