**AMERICAN COUNCIL OF LIFE INSURANCE, Plaintiff,**

v.

**Eugene A. LUDWIG, in his Official Capacity as the Comptroller of the Currency of the United States,**

**Office of the Comptroller of the Currency Defendants,**

**Magna Bank, N.A. Intervenor/Defendant.**

**No. 97–CV–0033.**

United States District Court, District of Columbia.

March 31, 1998.

tion has run, and automatically receive credit for the income on her 1992 and 1993 tax returns.

John G. Roberts, Jr., John C. Keeney, Jr., David G. Leitch, Hogan & Hartson, LLP, Washington, DC, for American Council of Life Ins.

Julie L. Williams, Robert B. Serino, L. Robert Griffin, Horace G. Sneed, Office of Comptroller of Currency, Washington, DC, for Eugene A. Ludwig, Office of Comptroller of Currency.

John V. Austin, Milton D. Andrews, Thompson Coburn, Washington, DC, for Magna Bank.

John J. Gill, Michael F. Crotty, Washington, DC, for American Bankers Ass'n.

Richard M. Whiting, Washington, DC, for The Bankers Roundtable.

James T. McIntyre, Jr., Washington, DC, for Ass'n of Banks in Insurance.

Wade L. Nash, Wade L. Nsh, Jefferson City, MO, for Missouri Bankers Ass'n.

## *MEMORANDUM*

JUNE L. GREEN, District Judge.

Before the Court are Defendants Eugene A. Ludwig ("Comptroller") and the Office of the Comptroller of the Currency's ("OCC") motion to dismiss on the pleadings or in the alternative, for summary judgment; the opposition and reply thereto; a statement of points and authorities by *amicus curiae,* American Bankers Association, Bankers Roundtable, Association of Banks and Missouri Bankers, and the response thereto. Intervenor/Defendant Magna Bank, N.A., has filed its own motion for dismissal or for summary judgment, which is opposed by the Plaintiff.

For the reasons that follow, Defendants' motions to dismiss are denied, but their alternative motions for summary judgment are granted.

## I. BACKGROUND

The Plaintiff in this case is a non-profit trade association representing 577 insurance companies. Plaintiff filed this action in response to a decision made by the Comptroller of the Currency concerning the Intervenor/Defendant, Magna Bank.

On September 21, 1995, Magna Bank of Missouri and Magna Bank of Illinois, two state-chartered banks, each sent a Letter of Intent to the OCC seeking to convert from state to national bank status, pursuant to 12 U.S.C. § 35 (1994). Magna Bank of Missouri requested to retain ownership in certain corporate assets, which included two subsidiaries: MGI Insurance Agency, Inc. ("MGI Insurance"), and Inbank Insurance Agency, Inc. ("Inbank Insurance"). These subsidiaries act as agents for the sale of annuities, term, universal and whole life insurance, health insurance, disability insurance and long-term care insurance. (A.R. I at 189–92; AR II at 375.) On November 15, 1995, the Comptroller of the Currency issued opinions approving of the conversion of the two banks and granting permission for the merger of Magna Bank of Illinois into Magna Bank of Missouri (collectively "Magna"). The Comptroller also authorized Magna's retention of ownership of the stock of the corporation engaged in insurance agency activities (MGI Insurance and Inbank Insurance). The Comptroller approved Magna's retention of this stock pursuant to 12 U.S.C. § 35, which ostensibly gives him the discretion to permit a state bank converting into a national bank to "retain and carry" certain nonconforming assets.

Plaintiff challenges the Comptroller's interpretation of this provision of the statute and states that it is contrary to the National Banking Act ("NBA"), 12 U.S.C. § 1 *et. seq.* (1994), which limits the authority of national banks to engage in a wide range of activities.

Plaintiffs point specifically to 12 U.S.C. § 92 (1994), which permits national banks to sell insurance, but only if the bank is "located and doing business in any place the population of which does not exceed five thousand inhabitants." 12 U.S.C. § 92. The insurance agencies in this case operate in part in offices situated in communities with populations that exceed 5,000. (A.R. I at 12.)

In its complaint, Plaintiff seeks a declaration that the OCC exceeded the statutory grant of authority in 12 U.S.C. § 35, and in so doing violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 552(a)(1)(D), and the Federal Register Act ("FRA"), 44 U.S.C. § 1505(a)(3). Plaintiff also seeks a permanent injunction prohibiting the OCC from allowing Magna or any other national bank from engaging in insurance activities in violation of the NBA.

## II. DISCUSSION

The Defendants' motion, in the first instance, is made pursuant to Federal Rule of Civil Procedure 12(b)(6), which allows dismissal when the Complaint fails to state a claim upon which relief can be granted.[1] When assessing the adequacy of a Complaint under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the Plaintiff's allegations as true and construe those allegations in a light most favorable to the Plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Moreover, "a motion to dismiss should be granted only when it appears beyond doubt that, under any reasonable reading of the complaint, the Plaintiff will be unable to prove any set of facts that would justify relief." *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987).

### A. *Reviewability Under the Administrative Procedure Act*

The OCC seeks dismissal on the basis that the Comptroller's decision to allow Magna Bank to retain its nonconforming assets following conversion, is discretionary and therefore not judicially reviewable.

---

1. The first issue in this case is whether the Court has jurisdiction to review the Comptroller's discretionary activity. Such an analysis is not fact-dependent and can be analyzed under the standard for motions to dismiss on the pleadings rather than summary judgment.

The APA sets forth provisions for judicial review of agency actions, 5 U.S.C. §§ 701–706, with a strong presumption toward judicial reviewability. *See Dickson v. Secretary of Defense,* 68 F.3d 1396 (D.C.Cir.1995). That presumption, however, is limited by 5 U.S.C. § 701(a)(2), which prevents judicial review of agency decisions "to the extent that . . . [the] agency action [at issue] is committed to agency discretion by law." The reasoning behind section 701(a)(2) is that judicial review should not be available in those instances where a court would have no meaningful standard against which to judge the agency's exercise of discretion. *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In other words, in such situations, discretion really does mean absolute discretion.

■ While determining which cases warrant such treatment has been the subject of some interpretation, authority is in general agreement that such unreviewability is a narrowly drawn exception. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In *Chaney,* for instance, the Supreme Court, while finding unreviewable the Food and Drug Administration's decision not to undertake certain enforcement action, also reaffirmed the narrowness of this exception. 470 U.S. at 837. Six months after the Supreme Court decided *Chaney,* the Court of Appeals for this circuit analyzed the reviewability issue in *Robbins v. Reagan,* 780 F.2d 37 (D.C.Cir.1985). In *Robbins,* the Court of Appeals viewed the *Chaney* decision simply as adding agency non-enforcement decisions to the small list of presumptively non-reviewable agency action, along with State Department action in foreign affairs and Federal Reserve Board decisions setting interest rates. 780 F.2d at 45 quoting (*Cardoza v. Commodity Futures Trading Comm'n,* 768 F.2d 1542, 1549 (7th Cir.1985)). More important, however, *Robbins* provides a framework for measuring suitability of judicial review for discretionary agency actions taken pursuant to 5 U.S.C. § 701(a)(2). That framework permits courts, even in the absence of statutory guidelines, to look not only to agency policy statements, but also to the statutory scheme by which congressional intent of a general goal might be inferred. 780 F.2d at 45.

The Plaintiff's position is that the discretionary language of 12 U.S.C. § 35 does not give the Comptroller the authority permanently to override statutory limitations on national bank activities as set forth in the NBA, and that this conflict provides a meaningful standard for judicial review. Pl. Opp. at 16.[2] As a further standard, Plaintiff points to section 35 itself which states that converting banks "shall have the same powers and privileges" as originally organized national banks.

With regard to any policy statements, Plaintiff cites the OCC's own policy manual issued to its field examiners which states "[g]enerally, converting institutions must dispose of ineligible assets within a reasonable time after conversion." (A.R. II at 561, (*Corporate Reference Manual/Conversion Examinations*).)

Finally, the Plaintiff argues that the Comptroller's longstanding prior practice of requiring converting banks to divest themselves of nonconforming assets, is a standard by which to measure the Comptroller's discretion here. The OCC does not dispute that this has been its practice. (Pl.'s Opp. to Def.'s motion at 16.)

■ The Court agrees with the Plaintiff. Given the presumption of judicial review and insofar as the *Robbins* case allows the Court to look toward such factors as a statutory scheme and/or policy statements, there are standards here by which this Court can measure the discretionary activity of the Comptroller. The existence of the NBA and its provisions limiting the very activities the Comptroller has granted, as well as the Comptroller's own policy statements and longstanding practices concerning that discretion, indicate to the Court that such discretion was not intended to be absolute, but subject to judicial review.

---

**2.** The NBA, among other things, prohibits national banks from engaging in the insurance business in locales with populations over 5,000. 12 U.S.C. § 92.

Having found that such review is available, the motion to dismiss on the pleadings must be denied. The remaining issues, whether the Comptroller properly exercised his discretion, are fact-dependent and, although there does not appear to be any factual dispute, are more appropriately analyzed under the OCC's alternative motion for summary judgment.

### B. Summary Judgment Standard

Unlike a motion to dismiss, which is made pursuant to Rule 12 of the Federal Rules of Civil Procedure, a motion for summary judgment is made pursuant to Fed.R.Civ.P. 56(c). Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In deciding a motion for summary judgment, the material before the Court "must be viewed in the light most favorable to the [nonmoving] party." *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### C. Standard of Review Under the APA

Finding that the Comptroller's actions are reviewable, the Court must next determine whether the Comptroller's interpretation of Section 12 U.S.C. § 35 is proper.

The Supreme Court, in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), set forth a multi-step analysis for making such a review. The Court must first look at the statute and/or its legislative history and decide " ... whether Congress has spoken directly to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Id.* at 842. If it is not clear or there is some ambiguity or if Congress was silent, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Whether it is permissi-

ble depends upon the reasonableness of the agency's interpretation. The Supreme Court concluded that the interpretation should be given "considerable weight" and "deference." *Id.* at 844.

■ Here, the dispute is over the meaning of 12 U.S.C. § 35 and whether it grants the Comptroller the authority to allow a state chartered bank, converting to a national bank, indefinitely to retain its nonconforming assets.

That section provides:

The Comptroller of the Currency may, in his discretion and subject to such conditions as he may prescribe, permit such converting bank to retain and carry at a value determined by the Comptroller such of the assets of such converting bank as do not conform to the legal requirements relative to assets acquired and held by national banking associations.

*Id.*

The Plaintiff argues that this section is silent on the issue of whether a converting bank must eventually divest itself of nonconforming assets and, in any event, that interpreting section 35 to allow banks to retain such assets indefinitely would give them privileges beyond other nationally chartered banks. Plaintiff argues that such a result could not have been intended by Congress and cites the first part of section 35 and the NBA in support.

The Plaintiff's interpretation is not correct. There is nothing on the face of the statute or in its legislative history that requires such a narrow reading as Plaintiff suggests. The terms "retain and carry," are plain enough, and given their ordinary meaning, do not suggest to the Court that ultimate divesture of nonconforming assets is a built in, yet unstated component of section 35. The legislative history also supports the Comptroller's interpretation, showing that the purpose of section 35 was to remove impediments from state banks seeking to convert to national bank status by allowing them to retain their nonconforming assets.[3] In fact, the legisla-

---

**3.** *See, e.g.,* H.R.Rep. No. 742, 74th Cong., 1st Sess., at 19 (1935); *Banking Act of 1935: Hear-* *ing on H.R. 5357 Before the House Comm. on Banking and Currency,* 74th Cong., 1st Sess. 664

tive history suggests that encouraging banks to convert (while keeping them financially sound by avoiding divestiture) appears to be an important purpose of section 35.

The Plaintiff makes much of a preceding paragraph of section 35, which states:

When the Comptroller has given to such bank or banking association a certificate that the provisions of this Act have been complied with, such bank or banking association ... shall have the same powers and privileges, and shall be subject to the same duties, liabilities, and regulations, in all respects, as shall have been prescribed by the Federal Reserve Act and the National Bank Act for institutions originally organized as national banking associations.

12 U.S.C. § 35. A full reading of the statute, however, makes it clear to the Court that this portion of section 35 is meant to set the baseline for how converting banks are to be regarded once they have completed the conversion process. It comes at the end of a long paragraph on what the bank must do in order to convert. It is compelling to the Court that the "retain and carry" paragraph, by its placement at the end of the section, was intended to modify the earlier stated provisions by giving the Comptroller the broad discretion to make exceptions with regard to retention of nonconforming assets.[4] To find otherwise would be to imply limitations on section 35 that are not stated on its face. The Court can not do that.

Under section 35, the Comptroller has the express authority to permit a converting bank to retain its nonconforming assets "subject to such conditions as he may prescribe ..." *Id.* If he so chose, the Comptroller, under this provision, could properly decide that those "conditions" would be the permanent retention of the nonconforming assets.

The language of 12 U.S.C. § 35 is clear to the Court and under the *Chevron* analysis, this ends further judicial inquiry on statutory interpretation.

Even if this were not the case, the Court would still find the Comptroller's interpretation to be proper insofar as it was reasonable. As part of its decision, the Comptroller relied on a 17–page legal memorandum, prepared by two counsel for the OCC, interpreting section 35. (A.R. I at 26.) That interpretation, like the Court's, relies upon the plain language of section 35 and its legislative history, and concludes that retention of nonconforming assets is at the broad discretion of the Comptroller. (A.R. 1 at 27.) Such a construction is permissible and should be given controlling weight.[5]

### D. Review of the Comptroller's Decision Concerning Magna

In reviewing whether the Comptroller applied section 35 properly to Magna's application, the Court must decide whether the activity was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). That review is guided by *Motor Vehicle Mfrs. Ass'n. of the United States v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), which states:

The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' ... Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Con-

---

(March 26, 1935); *Banking Act of 1935: Hearing on S. 1715 and H.R. 7617 Before the Senate Subcomm. of the Comm. on Banking and Currency,* 74th Cong., 1st Sess. 160 (May 1, 1935).

4. Congress, by expressly including the Federal Reserve Act and the National Bank Act in the first paragraph, clearly considered their existence in formulating the "retain and carry" language of the second paragraph.

5. Contrary to Plaintiff's position that deference to the agency's interpretation is inappropriate where more than one agency interprets the same statute, the Supreme Court has expressly held that courts should defer to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws. *Smiley v. Citibank,* 517 U.S. 735, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996), citing *NationsBank of N. C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995).

gress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

[citations omitted]

■ That case also states that a reviewing court should "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Id.* The Comptroller points to its own policy statements made in 1993 to explain its decision to allow Magna to retain the nonconforming insurance subsidiaries. *See* Remarks by Eugene A. Ludwig, Comptroller of the Currency, Merrill Lynch Financial Services Conference, New York, New York, September 12, 1993, reprinted in *Office of the Comptroller of the Currency Quarterly Journal* ("OCC Quarterly Journal"), December 1993, at 23, 25. In these statements, the Comptroller related the disadvantages of reducing the range of products and services of a financial institution as impoverishing the marketplace and the economy by reducing competitiveness and soundness of financial institutions. *Id.* The Comptroller stated,

> I believe new bank products and services should be presumed permissible if they satisfy two tests:
>
> - First, they must not cause material safety and soundness problems.
> - Second, adding the new product or service should, on balance, benefit customers of financial services—and here I mean consumers in the broadest sense, large and small, businesses as well as individuals.
>
> Win, lose or draw, where a new power or innovation meets these tests, I will approve it—if I have the authority to do so. Where I do not have that authority, I will support—and where appropriate seek—legislative change to permit the expansion.

*Id.*

In 1994, the Comptroller reinforced this policy in testimony before Congress. The Comptroller explained the need for the OCC's policy to allow banks to participate in providing financial services to the fullest extent permissible under the banking laws: "We must allow banks to evolve so that they are more diversified, can earn adequate returns, and thus can continue to attract new investment." Statement of Eugene A. Ludwig, Comptroller of the Currency, before the Senate Comm. on Banking, Housing, and Urban Affairs, Washington, D.C., September 22, 1994, reprinted in OCC Quarterly Journal, December 1994, at 60. The OCC also proposed rulemaking in 1994 stating the agency's intent to permit converting banks to retain nonconforming assets, including subsidiary corporations, to the full extent permitted by 12 U.S.C. Section 35. *See* 59 Fed.Reg. 61,034 (1994) (proposed rule) (codified at 12 C.F.R. § 5.24).

The Court considers the Comptroller's interpretation of the last provision in 12 U.S.C. § 35 as reasonable, in light of the language of the statute and the aforementioned evidence of the OCC's policy to approve, where possible, banks' participation in financial services activities. While this policy was not iterated by the Comptroller with specific regard to Magna Bank, the Court can reasonably discern the agency's path toward the Magna Bank decision by looking to the evidence of this policy.

The Plaintiff relies on the Comptroller's decisions in the past 60 years regarding converted banks' retention of nonconforming assets in arguing that the provision in section 35 is intended only for transitional purposes during conversion. In light of the OCC's more recent policy to allow banks to participate in providing financial services to the fullest extent possible, the Court rejects this argument. This change of policy distinguishes the circumstances of the Magna decision from prior OCC decisions that had required converting banks to divest their nonconforming assets.

In addition to this policy to permit banks to engage in the broadest range of services permissible, the record shows that the OCC, in applying section 35, considered whether retention of the nonconforming assets would present any safety and soundness problems, and concluded that it would not. (A.R. I at

1, 24, 196–97, A.R. at 29, n. 9.) Moreover, it appears that the OCC considered the role the subsidiaries played in Magna's operations and took into account Magna's request to retain them. (AR II at 374–75, 383–88, 397.) Finally, the OCC considered whether it had the resources to supervise the retained subsidiaries, and concluded that it had the necessary staff with technical expertise. (A.R. II at 394, 401.)

This analysis, along with the framework of OCC's publicly articulated policy to permit the expansion of bank activities, convinces the Court that the Comptroller's decision to allow Magna Bank to retain its insurance subsidiaries was neither arbitrary, capricious nor an abuse of discretion.

### E. *Rule Making Versus Adjudication Under the APA*

The Plaintiff claims that the OCC's decision to permit Magna Bank to retain its insurance subsidiaries following conversion constitutes rulemaking under the APA and that such rulemaking is subject to the APA's notice and comment requirements. Plaintiff argues that the OCC failed to fulfill these procedural requirements, and therefore, the Comptroller's decision must be set aside because it was administered "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

Plaintiff emphasizes a portion of the definition of a "rule" in the APA, specifically:

> '[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval for ... financial structures or reorganizations thereof.

5 U.S.C. § 551(4).

The OCC disagrees with the Plaintiff's characterization of its decision as "rulemaking," and instead states that it is an "adjudication" because it involves the grant of a "charter" to Magna. *See* 5 U.S.C. § 551(9); *see also, Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)(characterizing a denial of a national bank charter as an adjudication and applying the arbitrary and capricious standard of review). More important, the Supreme Court in *Camp v. Pitts*, concluded that "neither the National Bank Act nor the APA requires the Comptroller to hold a hearing or to make formal findings on the hearing record when passing on applications for new banking authorities." *Id.* at 140–141; *see also, Citizens Nat'l, Bank of Maplewood v. Saxon*, 249 F.Supp. 557, 559 (E.D.Mo.1965), *aff'd, Webster Groves Trust Co. v. Saxon*, 370 F.2d 381 (8th Cir.1966). This type of informal adjudication obviously does not carry with it the same procedural requirements as formal adjudication.

■ With regard to Plaintiff's argument that the Comptroller's recent change in policy requires it to proceed by rulemaking, authority is to the contrary. The Supreme Court has determined that an agency is not prohibited from advancing new principles through adjudication and the choice between proceeding by adjudication or rulemaking lies "in the first instance" within the discretion of the administrative agency. *National Labor Relations Board v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). In reaching its decision in favor of the agency in *Bell Aerospace Co.*, the Supreme Court noted that theirs was "not a case in which some new liability [was] sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board pronouncements, nor [were] fines or damages involved." *Id.* at 295; *see also, Padula v. Webster*, 822 F.2d 97, 100 (D.C.Cir.1987)(stating that "[agency] [s]tatements that are merely prospective, imposing no rights or obligations on the respective parties, will not be treated as binding norms.") Such is the case here.

■ Insofar as adjudication does not require notice in the Federal Register and an opportunity for public comment as rulemaking does pursuant to 5 U.S.C. 553 (1966), the OCC is in compliance with the APA in issuing this informal adjudication, and Plaintiff's procedural claim must be dismissed.

**32**

### F. *Plaintiff's Motion to Supplement the Record*

Following the close of briefing in this matter, Plaintiff filed a motion to supplement the record with two letters: both from the Secretary of the Board for the Federal Reserve to the Comptroller stating the Board's opposition to proposed activities of two banks. The Defendants object to consideration of these letters and inclusion in the administrative record. The accuracy of these letters is not contested, and the Court sees no harm in considering them for the limited relevance they have to offer.

### III. *CONCLUSION*

For the reasons stated, the Court concludes that the Comptroller's decision to allow Magna Bank to retain its nonconforming assets under 12 U.S.C. § 35 is judicially reviewable. Nonetheless, the Comptroller's decision was not arbitrary, capricious or an abuse of discretion and is, therefore, upheld. Accordingly, the Defendants are entitled to judgment as a matter of law on their alternative motion for summary judgment. An appropriate Order accompanies this Memorandum.

### *ORDER*

For the reasons stated in the attached Memorandum of Law, the entire record in this case and for good cause shown, it is by the Court this 30th day of March 1998.

**ORDERED** that Defendants Comptroller of the Currency of the United States and the Office of the Comptroller of the Currency's alternative motion for summary judgment is **GRANTED**; it is further

**ORDERED** that Intervenor/Defendant Magna Bank's separate alternative motion for summary judgment is **GRANTED**; it is further

**ORDERED** that Judgment be entered in favor of all Defendants pursuant to Rule 56(c) of the Federal Rules of Civil Procedure; it is further

**ORDERED** that Defendants' separate motions to dismiss on the pleadings are **DENIED**; it is further

**ORDERED** that Plaintiff's motion to supplement the record is **GRANTED** and the Court accepts for filing the two letters referenced in the Memorandum of Law.